UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ANTHONY DELUCIA, JR.,

                Plaintiff,

      v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

_____

<u>DECISION & ORDER</u>

15-CV-6029P

## <u>PRELIMINARY STATEMENT</u>

        Plaintiff Anthony Delucia, Jr. ("Delucia") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 13).

        Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 10, 15). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Delucia's motion for judgment on the pleadings is denied.

# BACKGROUND

## I.  Procedural Background

Delucia protectively filed for SSI on April 17, 2012, alleging disability beginning on April 25, 2010, due to attention deficit hyperactivity disorder ("ADHD") and mental health issues including, Asperger's syndrome, mood disorder, and a learning disability.  (Tr. 220-21, 225).[1]  On June 25, 2012, the Social Security Administration denied Delucia's claim for benefits, finding that he was not disabled.  (Tr. 136-37).  Delucia requested and was granted a hearing before Administrative Law Judge Roseanne M. Dummer (the "ALJ").  (Tr. 100, 158-60, 161-87).  The ALJ conducted hearings on April 16, 2013 and July 10, 2013.  (Tr. 40-99, 100-35).  Delucia was represented at both hearings by his attorney, Justin Goldstein, Esq.  (Tr. 40, 100).  In a decision dated July 22, 2013, the ALJ found that Delucia was not disabled and was not entitled to benefits.  (Tr. 18-35).

On November 19, 2014, the Appeals Council denied Delucia's request for review of the ALJ's decision.  (Tr. 1-3).  Delucia commenced this action on January 16, 2015, seeking review of the Commissioner's decision.  (Docket # 1).

## II.  Relevant Evidence[2]

### A.  Educational Records

Records from the Rochester City School District suggest that Delucia exhibited behavioral problems while in the first and second grades.  (Tr. 243-52).  According to his

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Those portions of the treatment records that are relevant to this decision are recounted herein.  Delucia does not challenge the ALJ's physical RFC assessment.  Thus, records pertaining to Delucia's physical impairments are not summarized herein.

teachers, Delucia had difficulty with attention, concentration, and aggression. (*Id.*). His teachers recommended that he be evaluated for ADHD. (*Id.*).

Records from Brockport Central Schools demonstrate that Delucia struggled academically during grade school. (Tr. 491-529). Standardized testing administered when Delucia was in the sixth and seventh grades demonstrated that he scored in the basic level in English language arts and mathematics. (Tr. 508-11). Additional standardized testing administered when Delucia was in the eighth grade demonstrated that Delucia was partly proficient in social studies and proficient in science. (Tr. 504, 507). The testing also demonstrated that Delucia scored in the lowest level scale score for English language arts and the second lowest level scale score for mathematics. (Tr. 502, 505). Delucia's grades apparently improved during high school. (Tr. 529).

On November 22 and 23, 2004, when Delucia was approximately sixteen, he underwent a vocational assessment administered by G. Rusnak ("Rusnak"), MA, CRC. (Tr. 368-71). The purpose of the evaluation was to provide information for his educational program planning. (*Id.*). Delucia demonstrated excellent organizational skills, and his academic testing suggested that he was able to work at grade level or higher; his math skills were slightly higher than his reading comprehension. (*Id.*). Learning ability and style testing suggested that Delucia's learning abilities were generally high average. (*Id.*). Delucia expressed interest in attending Western Monroe County Career and Technical Education Center for Commercial Art ("WEMOCO") and then college. (*Id.*). Rusnak opined that the testing results demonstrated that Delucia possessed the academic levels and learning ability to be successful in achieving those educational goals. (*Id.*).

B.      **Medical Records**

1.      **Oak Orchard Community Health Center**

Treatment notes indicate that Delucia received primary care treatment from providers at Oak Orchard Community Health Center ("Oak Orchard") beginning in at least March 2002. (Tr. 589).  The notes suggest that Delucia sought treatment for behavioral and academic issues.  (*Id.*).  He was prescribed Dexadrine, which reportedly improved his ability to focus.  (Tr. 589-91).  Delucia had reportedly demonstrated behavioral difficulties since preschool.  (Tr. 592).  He repeated the second and fifth grades and had previously been prescribed Ritalin and Adderall.  (*Id.*).  It appears that he was previously diagnosed with ADHD and anxiety disorder.  (*Id.*).

Delucia's parents separated when he was four years old, and he had limited contact with his father, who reportedly suffered from substance abuse issues.  (*Id.*).  Delucia was assessed to have ADHD that was moderately controlled with Dexedrine.  (*Id.*).  The treating provider also questioned whether he suffered from medical issues or possibly a mood or anxiety disorder or early bipolar disorder.  (*Id.*).  Delucia also demonstrated some sexually inappropriate behavior.  (Tr. 593).  His treating provider discontinued Dexedrine, prescribed Concerta, and referred Delucia to mental health providers Karl Holt ("Holt") and Dr. Jakobi for evaluation. (Tr. 593-94).  Subsequent treatment notes suggest that Delucia responded well to Concerta, reporting much better focus and improved grades.  (Tr. 594).  He also reported that he was being considered for placement in a 15:1:1 classroom.  (*Id.*).  He passed seventh grade and started treatment with Holt.  (Tr. 596).

In February 2003, Delucia attended an appointment and reported that his grades and behavior at school had improved and that he continued to see Holt.  (Tr. 598).  In September

2003, treatment notes indicate that Delucia's mother had lost her job and was depressed. (Tr. 602). Delucia reported that his medication seemed to wear off in the afternoon and that his grades declined during the latter half of the eighth grade, necessitating summer school for science and math. (*Id.*). Delucia continued to see Holt for counseling and visited his father on the weekends. (*Id.*).

In October 2003, Delucia reported that the effects of an increased dosage of Concerta seemed to last throughout the day until approximately 6:00 p.m., assisting him in completing his homework. (Tr. 605). In December 2003, Delucia was reportedly doing better in school and did not have any complaints concerning his ability to focus. (Tr. 607). Because he had not seen Holt recently, he was encouraged to resume his counseling appointments. (Tr. 609).

Treatment notes from 2004 indicate that Delucia continued to perform well in school and had not received any complaints from his teachers. (Tr. 613). He reportedly was better able to concentrate in class if he listened to his CD player in one ear, which his teachers permitted. (*Id.*). His anger was reportedly better managed and, as a result, he did not attend counseling appointments with Holt as frequently. (*Id.*).

Treatment notes from 2005 indicate that on July 31, 2005 Delucia's mother died of a medication overdose at home and in Delucia's presence. (Tr. 616-18). His grandmother had given him Valium for panic episodes that Delucia was experiencing. (*Id.*). Delucia was prescribed Valium and was directed to attend a counseling appointment with Holt. (*Id.*). Later in the year, Delucia reported that he was doing well in school and had not experienced further panic symptoms, although he did experience mood swings. (*Id.*).

After 2005, Delucia did not return for treatment until April 6, 2010, when he met with Shauna McCorry ("McCorry"), RPA-C.  (Tr. 619-20).  At the time Delucia was twenty-one years old and reported difficulty concentrating and completing tasks.  (*Id.*).  According to Delucia, his concentration difficulties caused problems at his previous employment, particularly when asked to complete multiple tasks.  (*Id.*).  Delucia reported that he had previously taken Ritalin, Dexedrine, and Concerta.  (*Id.*).  He also reported that he had struggled with depression intermittently since 2005 when his mother had passed away, but that he had not received counseling or mental health treatment.  (*Id.*).  He was assessed to suffer from ADHD and depression and was prescribed Adderall.  (*Id.*).  Delucia declined therapy, although he was encouraged to attend counseling.  (*Id.*).

On May 6, 2010, Delucia returned for a follow-up appointment with McCorry. (Tr. 621-22).  He reported continued depression and only mild improvement in concentration. (*Id.*).  McCorry increased the dosage of Adderall and recommended a follow-up appointment in one month.  (*Id.*).

On September 1, 2011, Delucia returned for an appointment with Shauna Ketchum ("Ketchum"), RPA-C.  (Tr. 456-57).  Delucia reported that he had discontinued Adderall in October 2010 because he was unable to afford the medication.  (*Id.*).  Delucia explained that he was applying for disability benefits and that he suffered from a learning disability and ADHD.  (*Id.*).  Delucia explained that he had to establish that he was disabled and requested testing for ADHD and Asperger's Syndrome.  (*Id.*).  Ketchum advised that ADHD was not a basis to be awarded disability benefits and recommended that Delucia see a counselor to help process his mother's death.  (*Id.*).  Ketchum advised that a mental health counselor could

evaluate Delucia for any potential mental health disability.  (*Id.*).  She assessed ADHD and possible depression and anxiety and prescribed Adderall.  (*Id.*).

Delucia returned for a follow-up appointment with Ketchum on October 3, 2011. (Tr. 458-59).  He reported that he had not noticed any improvement with his medication and that he continued to have difficulty concentrating, completing tasks and sleeping, and experienced fluctuating moods, hyperactivity and anxiety.  (*Id.*).  He reported that he had contacted Unity Mental Health Center to schedule an appointment, but needed to provide his records from his treatment with Holt.  (*Id.*).  He was in the process of getting his records transferred.  (*Id.*). Ketchum increased his Adderall dosage and prescribed Prozac for depression.  (*Id.*).

On October 13, 2011, Delucia attended an appointment with John L. Hoffmann ("Hoffmann"), MD, requesting a referral to Unity for testing for ADHD and Asperger's. (Tr. 460-61).  Delucia reported that he was unable to hold a job, did not interview well, and had been declared disabled through New York State.  (*Id.*).  Hoffmann noted that Delucia had a past history of substance abuse, but had reportedly been sober for the previous two years.  (*Id.*). Hoffmann provided the requested referral.  (*Id.*).

Delucia returned for an appointment with Ketchum on November 21, 2011. (Tr. 462-63).  During the visit, he reported that his mood had improved and that he had no trouble concentrating.  (*Id.*).  Delucia indicated that he could observe a difference in symptoms when he failed to take his medication.  (*Id.*).  Delucia reported intermittent anxiety, mild depression, and continuing attention deficits.  (*Id.*).  Ketchum instructed him to continue taking his medications and to make an appointment with a psychiatrist.  (*Id.*).

On December 8, 2011, Delucia attended another appointment with Ketchum. (Tr. 464-65).  He reported increased depressive symptoms and that he had begun taking

melatonin, along with the Prozac prescribed by Ketchum. (*Id.*). He also reported that he had an appointment with a psychiatrist for testing for ADHD and Asperger's. (*Id.*). Ketchum increased his Prozac and melatonin dosages. (*Id.*).

On March 23, 2012, Delucia attended another appointment with Ketchum. (Tr. 467-68). Delucia reported that he had been evaluated by a psychiatrist and had been diagnosed with mild mood disorder, mild Asperger's Syndrome, and ADHD. (*Id.*). He complained that he felt that the Adderall wore off in the middle of the day and expressed interest in taking an additional dose in the afternoon. (*Id.*). Ketchum explained that he already was supposed to be taking Adderall twice per day. (*Id.*).

Delucia attended an additional appointment with Ketchum on April 23, 2012. (Tr. 469-70). Delucia requested a new referral for mental health treatment. (*Id.*). He explained that although he had been treating with Dr. Landsman, his office was not in a convenient location and he would not prescribe medication to Delucia. (*Id.*). Delucia reported that he was living with a friend and his friend's family and that he was unemployed. (*Id.*). Ketchum referred Delucia to the Porch Group for mental health treatment and reminded him to take Adderall twice daily. (*Id.*).

### 2. **Brad H. Landsman, Ph.D.**

Delucia was evaluated by Brad H. Landsman ("Landsman"), PhD, on December 23, 2011. (Tr. 435-42). Landsman evaluated Delucia for ADHD and Asperger's Syndrome, and also administered a variety of intelligence testing. (*Id.*). Delucia reported that his primary caretaker as a child was his grandmother, who passed away in 2003. (*Id.*). His mother died of an overdose the following year, and his stepfather had a substance abuse problem and was removed from the household for allegedly abusing Delucia's sister. (*Id.*). Delucia then lived

with his biological father, who had a history of bipolar disorder, and during that time Delucia reportedly abused drugs and alcohol.  (*Id.*).  Delucia reported that he had since moved in with a foster mother and had discontinued the use of drugs and alcohol.  (*Id.*).

According to Landsman, testing results indicated elevated scores for ADHD and Delucia's self-reported answers demonstrated a score of 28 on the Asperger's Spectrum Quotient.  (*Id.*).  According to Landsman, the mean score for a control group is 16.4 and 80% of Asperger's patients achieve scores of 32 or above.  (*Id.*).  Both Delucia and his foster mother indicated that he had difficulty with sleep, concentration, impulsivity, organization and that he frequently worried, fidgeted, blamed others for his mistakes, engaged in family conflict, and was unable to maintain employment.  (*Id.*).  Landsman also administered the WAIS-IV and the Woodcock-Johnson III assessments.  (*Id.*).

According to Landsman, Delucia had a full-scale intelligence quotient ("IQ") of 87, which placed him in the low average level of cognitive functioning.  (*Id.*).  Landsman opined that there was no significant difference between Delucia's verbal and nonverbal scores.  (*Id.*).  According to Landsman, Delucia's academic skills were consistent with his IQ, and he performed best on basic and untimed reading and arithmetic tasks.  (*Id.*).  Landsman did not assess any evidence of a learning disability.  (*Id.*).  Landsman observed that Delucia's clinical presentation and reported history was consistent with ADHD, combined type, but there was equivocal evidence of depressive disorder.  (*Id.*).  According to Landsman, Delucia exhibited many characteristics that were consistent with high functioning Asperger's Disorder, including poor social skills, difficulty making friends, cognitive rigidity, preference for routine, and high anxiety when faced with new situations.  (*Id.*).  Landsman recognized that Delucia had experienced trauma in his youth and recommended counseling appointments.  (*Id.*).

Delucia appears to have met with Landsman on February 10, 2012 for a counseling session.  (Tr. 579).  Treatment notes indicate that Landsman identified certain job restrictions for Delucia, including the avoidance of high stress jobs and the need for a smaller environment, hands-on training, and substantial feedback on performance and maintenance. (*Id.*).  Delucia's goal was to attend driver's education classes.  (*Id.*).  Landsman indicated that Delucia's Adderall dosage might need to be increased when he started volunteering through VESID.  (*Id.*).  Delucia appears to have attended additional appointments with Landsman on March 16, 2012, April 18, 2012 and June 23, 2012.  (Tr. 580-81).

### 3. **Unity Mental Health**

On October 1, 2012, Delucia had a mental health evaluation with Heather Noto ("Noto"), LMHC.  (Tr. 475-84).  Delucia reported that he had ADHD while in school and was provided special accommodations and special education classes.  (*Id.*).  Delucia also indicated that he had recently been diagnosed with Asperger's Syndrome and that he experienced anxiety on a daily basis.  (*Id.*).  He also reported intermittent depressive feelings stemming from his mother's death.  (*Id.*).  Delucia indicated that he had been prescribed Fluoxitine for his depression and felt that his moods were controlled throughout the day.  (*Id.*).

Delucia stated that his parents were divorced and that he had lived primarily with his mother and step-father.  (*Id.*).  According to Delucia, his father left when he was five years old and he did not have a relationship with him.  (*Id.*).  His mother died in 2005, which was traumatic for him.  (*Id.*).  Delucia reported that he abused drugs and alcohol after his mother's death, but that he stopped abusing substances three years ago.  (*Id.*).

Delucia reported that he recently re-started medication to address his ADHD. (*Id.*).  According to Delucia, he had previously stopped taking his medication when he lost his

insurance due to his mother's death.  (*Id.*).  Delucia reported that he had difficulty maintaining

employment and that he was currently unemployed, but attempting to obtain employment

through Access-VR.  (*Id.*).  He was currently working at Volunteers of America to maintain his

Medicaid benefits.  (*Id.*).

Noto assessed that Delucia did not meet the criteria for major depressive disorder

or anxiety disorder, but appeared to be experiencing some distress due to his trouble finding and

maintaining employment.  (*Id.*).  Noto diagnosed Delucia with adjustment disorder with mixed

anxiety and depression and recommended weekly therapy sessions and a psychiatric evaluation.

(*Id.*).

### 4.      <u>Unity Internal Medicine</u>

Treatment notes indicate that Delucia began receiving treatment at Unity Internal

Medicine on October 4, 2012.  (Tr. 650-55).  That day he met with Valentina Antonova

("Antonova"), MD.  He reported that he had been diagnosed with ADHD and that he was taking

Adderall to manage his symptoms, although he reported that he quickly builds resistance to

medications.  (*Id.*).  He was living with his grandparents, whom he had recently met and was

applying for disability benefits.  (*Id.*).  He denied any depression.  (*Id.*).  Delucia reported that he

had enough Adderall for two weeks and requested a prescription.  (*Id.*).  Antonova indicated that

she would need his medical records before providing the prescription.  (*Id.*).

Delucia returned for an appointment on March 13, 2013.  (Tr. 656-58).  He

requested a refill of his Adderall prescription and brought an evaluation completed by his

psychologist in January 2012.  (*Id.*).  Antonova did not understand why Delucia had been off of

his medications since October or why his psychiatrist would not prescribe the medication.  (*Id.*).

Delucia reported that he was doing well, had found employment, and was working on obtaining disability benefits.  (*Id.*).  Antonova provided a prescription for Adderall and Fluoxetine.  (*Id.*).

On April 8, 2013, Delucia returned for a follow-up appointment with Antonova. (Tr. 667-71).  Delucia reported that he needed a refill of his prescription for Adderall.  (*Id.*).  He reported that he was taking two tablets per day, as that was the amount his previous physician had advised him to take.  (*Id.*).  Antonova refilled his prescription, but indicated that she would not increase his dose.  (*Id.*).

### C.   Vocational Records

On March 28, 2012, Delucia met with John Hayes ("Hayes"), a vocational assessment counselor for an assessment.  (Tr. 448-52).  At the time of the appointment, Delucia was living with the family of one of his friends.  (*Id.*).  Hayes observed that Delucia's communication was reasonably good, although he appeared noticeably anxious.  (*Id.*).  Delucia reported significant difficulties in school, and Hayes noted that testing placed Delucia in the low average range.  (*Id.*).  Hayes opined that while Delucia was academically functional, he would likely have difficulty performing positions requiring more demanding reading, math, or use of subjective reasoning.  (*Id.*).  Hayes also noted that processing speed deficits seemed to have caused problems at previous employment.  (*Id.*).

According to Hayes, Delucia's work history was quite limited and was indicative of someone who had not been able to adapt to a work setting.  (*Id.*).  Delucia reported that he wanted someone to assess his limitations and believed that he needed to work in a small setting. (*Id.*).  He expressed interest in computers and reportedly was able to perform satisfactorily when shown what to do, as long as his involvement with other people was limited.  (*Id.*).

Hayes opined that Delucia would need considerable guidance and would need to continue counseling with Landsman or another counselor closer to home.  (*Id.*).  He had reportedly failed his driver's test on two occasions, so Hayes recommended that he get his permit renewed and use public transportation in the meantime.  (*Id.*).  Hayes indicated that rehabilitation technology was not required.  (*Id.*).

On April 20, 2012, Shelly P. Cogliandro ("Cogliandro"), SPC, completed an eligibility case note for Delucia.  (Tr. 443-47).  According to Cogliandro, Delucia had difficulty with executive functioning, working under pressure, and shifting from one task to the next.  (*Id.*).  She noted that he had graduated from high school with a local diploma and a two-year certificate from WEMOCO in Graphic Arts.  (*Id.*).  He was apparently identified as special education student and placed in a 15:1 classroom setting.  (*Id.*).

Congliandro reported that Delucia had a limited work history.  (*Id.*).  His last employment was as an injection molding machine operator, and he reportedly liked the repetitive nature of the work, although he found it difficult to meet production demands.  (*Id.*).  He was let go after three months.  (*Id.*).  His employer was reportedly willing to look for another placement for him, but Delucia did not have transportation.  (*Id.*).  Delucia also previously worked as a cashier at a fast food restaurant where he found it difficult to maintain pace.  (*Id.*).  As a result, he was not given many hours, and he eventually quit.  (*Id.*).  Congliandro instructed Delucia to obtain his permit in order to be referred for driver evaluation.  (*Id.*).  She also referred Delucia for vocational assessment and planning.  (*Id.*).

Career counselor M. Dianne Richardson ("Richardson") completed a vocational assessment on June 25, 2012.  (Tr. 532-40).  Richardson reported that Delucia was participating in a Work Experience Program assignment in which he worked as a donation worker for

Volunteers of America nineteen hours per week.  (*Id.*).  Richardson reported that Delucia was

friendly, polite, made excellent eye contact, maintained excellent attention, and worked very well

within the time constraints of the administered testing.  (*Id.*).  According to Richardson, Delucia

expressed interest in attending Monroe Community College to obtain an Associate's degree in

advertising.  (*Id.*).  He hoped to attend Rochester Institute of Technology to obtain a Bachelor's

degree in game design and development.  (*Id.*).  Richardson indicated that Delucia would need

accommodations in order to be successful in college.  (*Id.*).

The Test of Adult Basic Education ("TABE") was administered to Delucia by

Richardson.  (*Id.*).  His results placed him in the low adult secondary education level for reading

and in the high intermediate basic education level for mathematics.  (*Id.*).  According to

Richardson, Delucia was able to learn to follow simple, multistep directions and to read common

forms and manuals.  (*Id.*).  He could perform jobs that required him to interpret information from

various sources and to write or explain tasks to others.  (*Id.*).  He was also proficient in using

computers and could operate most common computer applications.  (*Id.*).  According to

Richardson, he could perform all four basic math operations.  (*Id.*).

Richardson administered additional testing designed to identify Delucia's

strengths and interests.  (*Id.*).  According to Richardson, Delucia's results matched the

occupations of architect, art director, artist, cartoonist, creative/technical writer, editor,

entertainer, graphic designer, multi-media artist and animator, musician, novelist, technical

illustrator, and web designer/developer.  (*Id.*).  Delucia was amenable to attempting to obtain an

apprenticeship or internship in the advertising/commercial arts or graphic design fields before

attending college.  (*Id.*).  Richardson opined that if Delucia were to attend college, he would

require financial assistance and accommodations, including extended time for test taking, a quiet

room for test taking, and extended time to complete written or research projects.  (*Id.*).

According to Richardson, if Delucia obtained an internship, he would require financial assistance

for transportation and might need assistance with updating his resume, practicing interview

techniques, and one-on-one attention and support to ensure proper training at any new position.

(*Id.*).

      On August 1, 2012, Delucia met with Cogliandro to discuss his employment

goals.  (Tr. 543).  Cogliandro advised Delucia that if he wanted to attend MCC, he should

consider moving closer to Rochester so that he could use public transportation to get to class.

(*Id.*).  Delucia agreed to speak to his DSS worker about finding alternate housing and to consider

applying to MCC for the spring semester.  (*Id.*).

      On August 28, 2012, Cogliandro was informed that Delucia needed assistance

finding an apartment.  (Tr. 544).  Cogliandro contacted Delucia and provided him with resources

to assist in finding other living arrangements.  (*Id.*).

      On September 10, 2012, Delucia contacted Cogliandro and informed her that he

would be moving into his grandparents' home in Greece, New York, which would provide him

access to a bus line.  (Tr. 545).  Delucia planned to contact MCC to apply and complete the

necessary financial forms.  (*Id.*).  He hoped to begin classes in January 2013.  (*Id.*).  On October

10, 2012, Delucia informed Cogliandro that he had obtained a new therapist and primary care

physician who were close to his new residence.  (Tr. 546).  He also reported that he had

completed the paperwork to attend MCC and was scheduled to take a placement test.  (*Id.*).

      On January 2, 2013, Delucia met with Cogliandro to revise his vocational goals.

(Tr. 547-48).  Delucia reported that he no longer lived with his grandparents and was living with

his sister, her boyfriend, and her boyfriend's mother.  (*Id.*).  Delucia indicated that he needed to

obtain a job in order to support himself.  (*Id.*).  He expressed interest in jobs in which the work was very routine and allowed him to move around.  (*Id.*).  Cogliandro suggested employment in a warehouse or machining position.  (*Id.*).  Delucia requested assistance with his job search, particularly with respect to his interviewing skills.  (*Id.*).  Cogliandro referred him for programming and suggested placement in an integrated setting.  (*Id.*).  She did not expect that extended services or post-employment services would be provided.  (*Id.*).  She also indicated to Delucia that his impairments might not warrant disability benefits because he was currently capable of working.  (*Id.*).

Notes indicate that Delucia began his employment search on February 7, 2013, and on February 20, 2013, was hired by Quantum Aviation Services as a material handler to begin paid training on March 11, 2013.  (Tr. 549).  The notes also indicate that Delucia would be working twenty-five hours per week and at a weekly wage of $ 381.  (Tr. 556).  His job duties would include ground handling and aircraft cleaning.  (*Id.*).  Cogliandro opined that Delucia would not require any post-employment services in order to maintain his employment.  (*Id.*).

D.    **Medical Opinion Evidence**

1.    **Kavitha Finnity, PhD**

On June 16, 2011, state examiner Kavitha Finnity ("Finnity"), PhD, conducted a consultative psychiatric evaluation of Delucia.  (Tr. 644-47).  Delucia reported that he lived with his friend's family.  (*Id.*).  Delucia reported he had obtained a high school diploma, had attended special education classes, and was not currently employed.  (*Id.*).  He had previously been employed as a machinist and had also worked at a fast food restaurant and a car wash.  (*Id.*).  Delucia reported previous mental health treatment with Holt, but indicated that he had ceased treatment due to a lack of insurance after his mother's death.  (*Id.*).

According to Delucia, he experienced difficulty sleeping and had a variable appetite.  (*Id.*).  Delucia reported depressive symptoms, including a dysphoric mood, crying, and irritability.  (*Id.*).  Delucia also reported diminished self-esteem and difficulties with social interactions, concentrating, focusing, maintaining attention, learning, organization, and planning. (*Id.*).  Delucia indicated that he was able to care for his personal hygiene, cook, clean, do laundry, shop, and manage his money.  (*Id.*).  Delucia also reported that he socialized with friends, had a good relationship with his family, and enjoyed skateboarding and playing video games.  (*Id.*).

Upon examination, Finnity noted that Delucia appeared appropriately dressed and well-groomed, with normal gait, motor behavior, posture, and eye contact.  (*Id.*).  Finnity opined that Delucia had fluent, clear speech with adequate language, coherent and goal-directed thought processes, full range affect, neutral mood, clear sensorium, full orientation, and average to below average intellectual functioning with a general fund of information appropriate to his experience. (*Id.*).  Finnity noted that Delucia's attention and concentration were intact.  (*Id.*).  Finnity found Delucia's recent and remote memory skills intact.  (*Id.*).  According to Finnity, Delucia recalled three out of three objects immediately and two out of three objects after five minutes, and he completed five digits forward and four backward.  (*Id.*).

According to Finnity, Delucia can follow and understand simple directions, perform simple tasks, maintain a regular schedule, learn new tasks, perform complex tasks with supervision, make appropriate decisions and relate with others, although Delucia has difficulty with attention and concentration and "some difficulty" dealing with stress.  (*Id.*).  According to Finnity, Delucia can manage his own finances, and his prognosis was fair to good.  (*Id.*).

2.      **Landsman's Opinion**

On February 13, 2012, Landsman completed a psychological assessment for determination of employability regarding Delucia's ability to perform work-related activities, the relevant portions of which are discussed herein.  (Tr. 559-62).  Landsman opined that Delucia suffered from Asperger's Disorder, ADHD combined, and a learning disorder, not otherwise specified.  (*Id.*).  According to Landsman, Delucia was very limited[3] in his ability to perform simple and complex tasks independently and moderately limited[4] in his ability to follow, understand and remember simple instructions and directions, maintain attention and concentration for role tasks, regularly attend to a routine and maintain a schedule, and maintain basic standards of hygiene and grooming.  (*Id.*).  Landsman opined that Delucia had no evidence of limitations in his capacity to perform low stress and simple tasks.  (*Id.*).  He also opined that Delucia was able to work for up to forty hours per week with reasonable accommodations, including a low stress job where performance speed was not critical, customer interaction was limited, and hands-on tasks with substantial feedback regarding his work performance was provided.  (*Id.*).  According to Landsman, Delucia would have difficulty performing in high stress or "low structure" work environments.  (*Id.*).

3.      **Yu-Ying Lin, PhD**

On June 13, 2012, state examiner Yu-Ying Lin ("Lin"), PhD, conducted a consultative psychiatric evaluation of Delucia.  (Tr. 378-81).  Delucia reported that he lived with his friend's family.  (*Id.*).  Delucia reported he had obtained a high school diploma, had attended special education classes, and had attended vocational training at WEMOCO.  (*Id.*).  He was currently employed full time at Volunteers of America since May 2012 and had left his previous

---

[3]  Very limited was defined to indicate an inability to function 25% or more of the time.  (*Id.*).

[4]  Moderately limited was defined to indicate an inability to function 10-25% of the time.  (*Id.*).

job because it was a temporary placement.  (*Id.*).  Delucia reported that he had been receiving

mental health treatment since July 2011.  (*Id.*).

According to Delucia, he experienced difficulty sleeping and had a variable

appetite.  (*Id.*).  Delucia reported occasional sadness since his mother's death but denied current

depression.  (*Id.*).  Delucia also reported symptoms of situational anxiety, including excessive

worry, irritability, restlessness, and difficulty concentrating, but he denied anxiety.  (*Id.*).  He

also reported attention issues, including distractibility, short attention spans, fidgety behavior,

talking excessively, and making careless mistakes.  (*Id.*).  He also stated that he was able to cope

by shaking his legs or rocking back and forth.  (*Id.*).  Delucia indicated that he was able to care

for his personal hygiene, cook, clean, do laundry, shop, and manage his money.  (*Id.*).  Delucia

reported that he did not have a driver's license but could use public transportation.  (*Id.*).

Upon examination, Lin noted that Delucia appeared casually dressed with a

stained shirt and well-groomed, with normal gait, motor behavior, posture, and eye contact.

(*Id.*).  Lin opined that Delucia had fluent, clear speech with adequate language, coherent and

goal-directed thought processes, full range affect, euthymic mood, clear sensorium, full

orientation, and average to below average intellectual functioning.  (*Id.*).  Lin noted that

Delucia's attention and concentration were intact.  (*Id.*).  Lin found Delucia's recent and remote

memory skills to be moderately impaired due to distractibility.  (*Id.*).  According to Lin, Delucia

could recall three out of three objects immediately and one out of three objects after a delay, and

he could complete six digits forward and four backward.  (*Id.*).

According to Lin, Delucia could follow and understand simple directions and

instructions, perform simple tasks independently, maintain attention and concentration, maintain

a regular schedule, learn new tasks, perform complex tasks with supervision, make appropriate

decisions and relate with others, although Delucia was not able to deal appropriately with stress due to distractibility.  (*Id.*).  According to Lin, Delucia could manage his own finances, and his prognosis was fair.  (*Id.*).  Lin recommended that Delucia continue with psychiatric treatment and consider individual psychological therapy and vocational training.  (*Id.*).

### 4.    E. Kamin, Psychology

On June 22, 2012, agency medical consultant Dr. E. Kamin ("Kamin") completed a Psychiatric Review Technique.  (Tr. 382-95).  Kamin concluded that Delucia's mental impairments did not meet or equal a listed impairment.  (*Id.*).  According to Kamin, Delucia suffered from mild limitations in his activities of daily living and in his ability to maintain social functioning and to maintain concentration, persistence, or pace.  (*Id.*).  In addition, according to Kamin, Delucia had not suffered from repeated episodes of deterioration.  (*Id.*).  Kamin completed a mental Residual Function Capacity ("RFC") assessment.  (Tr. 396-400).  Kamin opined that Delucia suffered from moderate limitations in his ability to maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, and complete a normal workday and workweek without interruptions from psychologically-based symptoms.  (*Id.*).  Kamin opined that Delucia retained the RFC for simple task work.  (*Id.*).

### 5.    Christine Ransom, PhD

On May 6, 2013, state examiner Christine Ransom ("Ransom"), PhD, conducted a consultative psychiatric evaluation of Delucia.  (Tr. 673-76).  Delucia reported that he lived with his sister, her boyfriend and her boyfriend's mother.  (*Id.*).  He reported he had graduated from high school with special education classes for a learning disability and was currently employed as a mail handler, although he had recently injured his arm so had been out of work.  (*Id.*).

Delucia reported that his primary care physician prescribed him medication for depression and ADHD.  (*Id.*).  Delucia indicated that the medication was effective and denied current signs or symptoms of depression, anxiety, panic attacks, manic symptomatology, thought disorder, or cognitive symptoms or deficits.  (*Id.*).  Delucia indicated that he was able to care for his personal hygiene, cook, clean, do laundry and shop, but needed assistance to manage his money due to poor arithmetic skills.  (*Id.*).  Delucia also reported that he socialized with friends and family and enjoyed a variety of activities and hobbies.  (*Id.*).

Upon examination, Ransom noted that Delucia appeared appropriately dressed and groomed, with normal gait, motor behavior, and eye contact.  (*Id.*).  Ransom opined that Delucia had fluent, clear speech with average language, coherent and goal-directed thought processes, neutral mood, full range affect, clear sensorium and full orientation, and low average intellectual functioning with an average general fund of information.  (*Id.*).  Ransom noted that Delucia's attention and concentration were intact.  (*Id.*).  Ransom found Delucia's recent and remote memory skills intact.  (*Id.*).  According to Ransom, Delucia could recall three out of three objects immediately and three out of three objects after five minutes, and he could complete five digits forward and three backward.  (*Id.*).

According to Ransom, Delucia could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration for simple tasks, and maintain a simple regular schedule, learn simple new tasks, perform complex tasks, relate adequately with others, and appropriately deal with stress.  (*Id.*).  Ransom further opined that the results of the evaluation were consistent with Delucia's allegations.  (*Id.*).  Ransom opined that Delucia's prognosis was good with continued treatment.  (*Id.*).

On the same date, Ransom conducted an intelligence evaluation of Delucia. (Tr. 677-80). According to Ransom, testing demonstrated that Delucia had a Full Scale IQ of 82. (*Id.*). Ransom stated that the test results indicated that Delucia demonstrated average functioning in vocabulary development, the ability to form abstract concepts based on visual and geometric information, the ability to form visual part-whole relationships, attention and concentration, short-term verbal memory, visual processing speed, and ability to copy geometric designs graphically. (*Id.*). The results also indicated that Delucia demonstrated low average functioning in his ability to analyze and synthesize visual and geometric information and borderline functioning in his ability to form verbal abstractions and arithmetic skills. (*Id.*). His reading and arithmetic abilities and written language skills were low average, and he could read at a tenth grade level, which indicated average word decoding skills. (*Id.*).

Ransom also completed a medical source statement assessing Delucia's mental ability to do work-related activities. (Tr. 681-83). According to Ransom, Delucia had no limitations in his ability to understand, remember and carry out simple and complex instructions, make judgments on simple and complex work-related decisions, interact appropriately with the public, supervisors and coworkers, and respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*).

### 6.    Joseph Steiner, PhD

On June 12, 2013, Joseph Steiner ("Steiner"), PhD, completed medical interrogatories regarding Delucia's mental impairments. (Tr. 700-04). Steiner indicated that he had reviewed the administrative record and that the following impairments were established by the evidence: ADHD, major depressive disorder, alcohol dependence in remission, cannabis dependence in remission, depressive disorder, not otherwise specified, Asperger's Disorder, and

learning disorder.  (*Id.*).  Steiner opined that Delucia suffered from mild limitations in his ability

to perform activities of daily living and maintain concentration, persistence and pace, and

moderate limitations in his ability to maintain social functioning.  (*Id.*).  According to Steiner,

Delucia's impairments did not meet or equal a listed impairment.  (*Id.*).  Steiner opined that the

limitations assessed by Lin, Hayes, Landsman, Finnity, and Ransom were supported by the

record, although he noted that there was some disagreement over the severity of Delucia's

limitations.  (*Id.*).

 Steiner also completed a medical source statement regarding Delucia's mental

ability to perform work-related activities.  (Tr. 705-07).  Steiner opined that Delucia was mildly

limited[5] in his ability to understand, remember and carry out complex instructions, make

judgments on complex work-related decisions, and interact appropriately with supervisors and

coworkers.  (*Id.*).  He opined that Delucia was moderately limited[6] in his ability to respond

appropriately with the public and to usual work situations and to changes in a routine schedule.

(*Id.*).  Steiner opined that Delucia was not limited in his ability to understand, remember and

carry out simple instructions and make judgments on simple work-related decisions.  (*Id.*).


### III. <u>Non-Medical Evidence</u>

 In his application for benefits, Delucia reported that he was born in 1988.

(Tr. 221).  Delucia reported that he had graduated from high school in a special education

classroom setting.  (Tr. 226).  According to Delucia, he had previously been employed as a

janitor, a fast food worker, and an injection molding worker.  (*Id.*).

---

[5]  Mild limitations were defined to indicate a "slight limitation in this area, but the individual can generally function well."  (*Id.*).

[6]  Moderate limitations were defined to indicate "more than a slight limitation in this area but the individual is still able to function satisfactorily."  (*Id.*).

According to Delucia, he cared for pets, worked at Volunteers of America for work experience, performed household chores, and played video games.  (Tr. 254).  Delucia indicated that he was able to care for his own personal hygiene without assistance and could prepare any meals so long as he had directions.  (Tr. 254-55).  According to Delucia, he was able to take out the garbage, vacuum, do laundry, mow the lawn, and wash dishes.  (Tr. 256).  Delucia did not have a driver's license.  (*Id.*).

Delucia reported that he was able to grocery shop every day for approximately thirty minutes.  (*Id.*).  According to Delucia, he watched television, skateboarded, played video games, and communicated with others on the computer or phone.  (Tr. 257-58).  Delucia reported that he went to Volunteers of America daily and did not have any problems getting along with his family or friends, although he was socially awkward in larger groups.  (Tr. 258).  Delucia reported difficulties with maintaining attention and following spoken instructions.  (Tr. 260).  He reported no difficulties following written instructions or getting along with people in positions of authority.  (*Id.*).  He also indicated that he had difficulty adjusting to change and managing stress and had difficulty with his memory.  (Tr. 261).

During the first administrative hearing, Delucia testified that he was approximately twenty-five years old and had graduated from high school.  (Tr. 104-05).  According to Delucia, he had an IEP and had attended classes in a 15:1 classroom.  (Tr. 105).  He was provided accommodations, including extra time on tests and the ability to take tests outside the classroom to eliminate distractions.  (Tr. 105-06).  Delucia testified that he lived with his sister, her boyfriend, and her boyfriend's mother.  (Tr. 111-12).  According to Delucia, his mother died when he was a junior in high school and he had been providing for himself as best he could since that time.  (Tr. 118).

Delucia testified that he had been diagnosed with severe ADHD, a mood disorder, and Asperger's Syndrome.  (Tr. 108).  According to Delucia, as a result of his mental impairments, he had difficulty performing fast-paced jobs.  (Tr. 108-09).  He also had difficulty maintaining attention in school and had low grades until he was placed in a smaller classroom setting.  (Tr. 109).  Delucia testified that he used to receive mental health treatment from Landsman, but was only able to see him once a month and was in the process of finding a provider who could see him on a weekly basis.  (Tr. 116).  Delucia's primary care physician prescribed Adderall to manage his ADHD and Fluoxetine for depression.  (*Id.*).

Delucia reported that he had recently started working part time at Quantum Aviation Services, but had not been able to work since March 31, 2013 due to a sprain in his triceps muscle.  (Tr. 106).  Delucia testified that he had received three days of training prior to working on his own.  (*Id.*).  Delucia indicated that his supervisors assisted him if he had questions or was doing something wrong.  (Tr. 121).  According to Delucia, he typically worked fifteen to twenty hours per week, although he could be required to work up to thirty-five hours per week.  (Tr. 107).  Delucia described his current job as fast-paced, but very routine, noting that he was required to perform the same tasks every day.  (Tr. 110).  The routine decreased Delucia's stress, and he found the position easier to perform than his previous employment positions.  (Tr. 110, 121).  He also reported difficulty working with new people.  (Tr. 110).

Delucia testified that he obtained his current employment through the help of VESID, a vocational program.  (Tr. 119).  According to Delucia, he started with VESID approximately three years before the hearing, but it took approximately one year for him to complete the required testing.  (Tr. 120).  Delucia also testified that during a portion of the time he was working with VESID, he was seeking assistance in applying to college, but eventually

changed his goal to obtaining employment.  (*Id.*).  His VESID counselor provided resources to assist him with his resume and application, and he obtained his current employment within two weeks of applying.  (Tr. 120-21).

Delucia testified that on a typical day he wakes up at approximately 10:00 a.m., makes his own breakfast, and goes outside, weather permitting, to skateboard, ride his bicycle, or walk.  (Tr. 113-14).  He attends appointments when necessary and typically watches television after dinner.  (Tr. 114).  Delucia testified that he does his own laundry and assists with household chores, including vacuuming, washing dishes, and mowing the lawn.  (*Id.*).  He enjoys writing music and poetry, chatting with friends online, and hanging out at the mall.  (*Id.*).

Vocational expert, Wm. Earl Thompson, Jr. ("Thompson"), also testified during the hearing.  (Tr. 123-33; 188).  The ALJ first asked Thompson to characterize Delucia's previous employment.  (Tr. 123).  According to Thompson, Delucia previously had been employed as a mail handler, auto detailer, and fast food clerk.  (*Id.*).

The ALJ asked Thompson whether a person would be able to perform jobs existing in the national economy who was the same age as Delucia, with the same education and vocational profile, and who was able to understand, remember and carry out only simple instructions, sustain attention for simple tasks for extended periods of two-hour segments in an eight-hour day, tolerate contact with coworkers and supervisors, tolerate only occasional interaction with the public, and adapt to changes as needed for simple, routine, repetitive-type tasks, but was unable to perform any fast-paced work or work involving high-production goals and would require hands-on training or verbal instruction in order to perform the job to learn it.  (Tr. 124).  Thompson responded that he believed the limitations described by the ALJ, particularly the requirement for hands-on supervision, were more consistent with accommodated

work and not a competitive work environment.  (Tr. 124-25).  The ALJ attempted to clarify that "hands-on" was meant to refer to the need for verbal instruction and not to include a limitation requiring supervision and instruction outside a normal training period.  (Tr. 125).

Thompson responded that verbal instructions or training demonstrations were employer specific and, although many employers include verbal instructions and demonstrations in their training, he was unable to identify the number of such positions in the national or local economy.  (Tr. 125-26).  The ALJ repeated the hypothetical, and Thompson reiterated that although he could identify jobs that existed for a person with such limitations, he was unable to identify the number of jobs that would provide verbal instruction or training.  (Tr. 127-28).  In response, the ALJ questioned whether someone would have to be able to read in order to perform a job and whether an employer would demonstrate or provide verbal instructions.  (Tr. 128).  Thompson responded that he was unable to indicate the number of employers that would be willing to provide verbal instruction.  (Tr. 128-29).  The ALJ then confirmed that they were both discussing unskilled work.  (Tr. 129-30).  The ALJ asked Thompson whether, assuming Delucia's testimony was credible and his impairments were supported by the medical evidence, there were any jobs that such a person could perform.  (Tr. 130).  Thompson indicated that there were not.  (*Id.*).

Delucia's attorney asked Thompson how long the typical training period was for unskilled work.  (Tr. 131).  Thompson responded that the training period could range from a short demonstration to as much as thirty days.  (*Id.*).  Delucia's attorney asked whether the need for additional instruction or retraining outside the typical training period would be considered an accommodated work setting.  (*Id.*).  Thompson indicated that if such additional instruction were required up to one-third of the time, the work would be considered accommodated work.  (*Id.*).

According to Thompson, an employee who required more frequent reminders and redirection from a supervisor than a typical employee would require an accommodated work situation. (Tr. 132-33).

During the subsequent hearing, Delucia testified that he was then working approximately fifteen hours per week unloading and sorting mail at the airport. (Tr. 44). According to Delucia, he worked with up to fifteen coworkers inside an airport warehouse near an active runway. (Tr. 44, 72, 81-82). There were two supervisors on-site, who sometimes provided him feedback or asked him to work more quickly. (Tr. 44). According to Delucia, he had not been reprimanded or had any formal write-ups. (Tr. 45). He also testified that although his job was generally not noisy, there was some noise when the containers containing the mail were brought in and when airplanes take off. (Tr. 82). Delucia testified that he was going to ask his physician to increase his Adderall dosage because he felt that the current dosage was inadequate, although he felt that his antidepressant was keeping his mood under control. (Tr. 45).

Steiner also testified during the hearing. (Tr. 48-65). Steiner testified that he treated patients suffering from both ADHD and Asperger's and discussed some limitations commonly associated with those diagnoses. (Tr. 48-53). Steiner reviewed Landsman's opinion during the hearing and testified that although Landsman had indicated that Delucia suffered from some moderate limitations, Landsman's opinion was nevertheless consistent with the record and with Steiner's own assessment of mild limitations because Landsman had opined that Delucia was able to participate in activities and work for up to forty hours per week. (Tr. 57). Steiner also reviewed the accommodations that Landsman had recommended and opined that although

28

the accommodations were greater than what an average person would require, they were not severe accommodations.  (Tr. 57-58).

Steiner opined that Delucia suffered from moderate limitations in his ability to remember, understand and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and set realistic goals and make plans independently of others. (Tr. 62-64).  He also opined that Delucia suffered from mild limitations in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, and travel in unfamiliar places and use public transportation. (*Id.*).  He further opined that Delucia did not suffer from any significant limitations in his ability to understand, remember and carry out very short and simple instructions, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (*Id.*).  According to Steiner, Delucia would need certain accommodations, including more time on tasks, low stress, substantial feedback on his performance, a quiet room, and simple tasks and simple instructions.  (Tr. 64).

A vocational expert, Ms. Heller ("Heller"), also testified during the hearing. (Tr. 65-99).  The ALJ asked Heller to characterize Delucia's previous employment.  (Tr. 68).

According to Heller, Delucia previously had been employed as a material handler, a detailer, an injection molding tender, a school janitor, and a fast food cook.  (Tr. 68-74).

The ALJ asked Heller whether a person would be able to perform any of Delucia's previous positions who was the same age as Delucia, with the same education and vocational profile, and who was able to understand, remember and carry out only simple instructions, respond and relate appropriately to coworkers and supervisors, sustain attention for simple tasks for extended periods of two-hour segments in an eight-hour day, and adapt to changes as needed for simple, routine, repetitive-type tasks, but was unable to perform any fast-paced work or work involving high-production goals, should be limited to brief and superficial contact with the public, and should not be exposed to excessive noise.  (Tr. 75-76). Heller responded that such a person would be able to perform the job of school janitor.  (Tr. 76). Heller indicated that such a person would be able to perform other positions in the national economy, including janitor for floor cleaning, housekeeper, garment sorter, linen room attendant, sandwich maker, laundry worker, laundry bagger, linen grader and sorter, cashier, and touch-up inspector.  (Tr. 77-81).

The ALJ then asked Heller whether her answers would change if the person required a quiet room to work.  (Tr. 83).  Heller asked the ALJ to quantify how quiet the room would need to be.  (*Id.*).  The ALJ asked Heller whether the DOT quantified noise levels in its position descriptions.  (Tr. 84).  Heller provided examples of positions with moderate noise levels, including work as an accountant and work inspecting circuit boards, and stated that perhaps a library position would be considered quiet.  (Tr. 84-86).  The ALJ instructed Heller to identify jobs that exposed employees to no more than moderate office noise.  (Tr. 85).  Heller

reviewed each of the positions that she had identified and confirmed that each of them involved only moderate noise.  (Tr. 84-86).

Delucia's attorney asked Heller whether an individual who required additional feedback on a daily basis regarding his or her work performance would be precluded from competitive work.  (Tr. 95).  Heller responded that she did not believe that would necessarily preclude competitive employment.  (*Id.*).  Delucia's attorney then asked Heller whether an individual could maintain employment if they were off task up to fifteen percent of the workday.  (*Id.*).  Heller responded that such an individual would likely be unable to maintain his or her employment.  (*Id.*).

## DISCUSSION

### I.    Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits

is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

(1)    whether the claimant is currently engaged in substantial gainful activity;

(2)     if not, whether the claimant has any "severe impairment"
        that "significantly limits [the claimant's] physical or mental
        ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments
        meets or equals one of the impairments listed in Appendix
        1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments,
        the claimant retains the residual functional capacity to
        perform his past work; and

(5)     if not, whether the claimant retains the residual functional
        capacity to perform any other work that exists in significant
        numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

##### A.     The ALJ's Decision

        In her decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 18-35).  Under step one of the process, the ALJ found that Delucia had not

engaged in substantial gainful activity since April 25, 2010, the amended alleged onset date.

(Tr. 21).  At step two, the ALJ concluded that Delucia has the severe impairments of ADHD,

depressive disorder, not otherwise specified, learning disorder, alcohol dependence in remission,

marijuana dependence in remission, and Asperger's Disorder.  (*Id.*).  At step three, the ALJ

determined that Delucia does not have an impairment (or combination of impairments) that

meets or medically equals one of the listed impairments.  (Tr. 21-23).  With respect to Delucia's

mental impairments, the ALJ found that Delucia suffered from moderate difficulties in social

functioning and maintaining concentration, persistence or pace, and mild limitations in activities of daily living.  (*Id.*).  The ALJ concluded that Delucia had the RFC to perform the full range of work at all exertional levels and to understand, remember and carry out simple tasks, sustain attention for simple tasks for extended periods of two-hour segments in an eight-hour day, adapt to changes as needed for simple, routine, repetitive-type tasks, and respond appropriately to supervisors and coworkers, but is limited to brief and superficial contact with the public and should not have to work in a fast-paced environment or a job requiring high production goals.  (Tr. 23).  At step four, the ALJ determined that Delucia did not have any past relevant work.  (Tr. 32).  Finally, at step five, the ALJ concluded that Delucia could perform other jobs in the local and national economy, including janitor (floor cleaning), linen room attendant, sandwich maker, laundry worker, housekeeper, garment sorter, laundry bagger, linen grader/sorter, cashier, and touch-up inspector.  (Tr. 33).  Accordingly, the ALJ found that Delucia is not disabled.  (Tr. 33-35).

>    **B.    Delucia's Contentions**

>    Delucia contends that the ALJ's mental RFC determination is not supported by substantial evidence and is the product of legal error.  (Docket # 10-1).  First, Delucia maintains that the ALJ improperly applied the treating physician rule when she determined to give Landsman's opinion limited weight.  (*Id.* at 21-23).  Next, Delucia maintains that the ALJ failed to account for some of the limitations assessed by Steiner.  (*Id.* at 24-26).  Third, Delucia contends that the ALJ improperly assumed an adversarial role, as evidenced by her determination to develop the record and her questioning of the vocational experts during the hearings.  (*Id.* at 27-34).

## II.      Analysis

### A.      RFC Assessment

An individual's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  When making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 370 F. App'x 231 (2d Cir. 2010).

I turn first to Delucia's contentions that the ALJ erred by failing to accord Landsman's opinion controlling weight.  Generally, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010) ("the ALJ [must] give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence").  "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).  The ALJ must consider:

    (1)  the frequency of examination and length, nature, and extent of the treatment relationship,

    (2)  the evidence in support of the physician's opinion,

    (3)  the consistency of the opinion with the record as a whole,

    (4)  whether the opinion is from a specialist, and

    (5)  whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x at 199.  The regulations also direct that the ALJ should "give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion."  *Halloran v. Barnhart*, 362 F.3d at 32 (alterations in original) (quoting 20 C.F.R. § 404.1527(c)(2)).

           Judged under relevant caselaw, it is unclear whether Landsman qualifies as a treating physician because the record suggests that he met with Delucia on only three occasions prior to rendering his opinion in this case.  (Tr. 563-81).  Although Landsman's opinion suggests that he met with Delucia on four occasions, the treatment records report meetings on December 23, 2011, January 20, 2012 and February 10, 2012.  (Tr. 559, 562-81).  In any event, the opinion was dated February 13, 2012, less than two months after Delucia's first appointment with Landsman.  The lack of an established, ongoing relationship undercuts Delucia's contention that Landsman should be considered a treating physician.  *See Patterson v. Astrue*, 2013 WL 638617, *8 (N.D.N.Y.) ("three examinations by [a physician] over the course of four months . . . does not constitute the type of 'ongoing relationship' that is required for finding that s/he is plaintiff's treating physician under the relevant regulations") (citing 20 C.F.R. §§ 404.1502, 416.902), *report and recommendation adopted*, 2013 WL 592123 (N.D.N.Y. 2013); *Cascio v. Astrue*, 2012 WL 123275, *3 (E.D.N.Y. 2012) (ALJ reasonably determined "that two isolated visits,

approximately one year apart, did not constitute an 'ongoing treatment' relationship rising to the level necessary for [the physician] to qualify as a treating physician"); *Rylee v. Astrue*, 2010 WL 3039602, *7 (S.D. Ala. 2010) ("[t]he treating physician rule does not apply to a physician who bases his opinions of a claimant's limitations on a limited number of visits"); *Seaton v. Astrue*, 2010 WL 2869561, *8 (N.D.N.Y. 2010) ("the ALJ's finding that . . . two visits did not constitute an 'ongoing treatment relationship' is reasonable and shall not be disturbed by this [c]ourt"); *Redmond v. Astrue*, 2009 WL 2383026, *7 (N.D.N.Y. 2009) (finding doctor was not treating physician whose opinion was entitled to controlling weight, noting it "appear[ed] that he only examined [p]laintiff on one occasion"); *Sapienza v. Shalala*, 894 F. Supp. 728, 733 (S.D.N.Y. 1995) ("[t]he administrative record provides substantial support for the ALJ's conclusion that [physician] was not a treating physician[;] [t]he record indicates that [he] had examined [plaintiff] only once").

In any event, although the ALJ gave "some," but not controlling, weight to Landsman's opinion, she in fact adopted many of the limitations assessed by Landsman. For instance, the ALJ limited Delucia to simple, routine, repetitive tasks involving simple instructions – consistent with Landsman's assessment that Delucia was moderately limited in his ability to follow, understand, and remember simple tasks, but was able to perform low stress and simple tasks. (Tr. 23, 561). Additionally, the ALJ determined that Delucia could sustain attention only for simple tasks for two-hour segments – consistent with Landsman's opinion that Delucia was moderately limited in his ability to attend to a routine and maintain a schedule, and to maintain attention and concentration for role tasks. Further, the ALJ limited Delucia to jobs that were not fast-paced or required production goals, and that required only brief, superficial

contact with the public – consistent with Landsman's opinion that Delucia required a low stress environment in which speed was not critical and customer interaction was limited.

Delucia maintains that, despite these limitations, the ALJ improperly rejected Landsman's opinions that Delucia was very limited in his ability to complete simple and complex tasks independently and would require hands-on training with verbal supervision. (Docket # 16 at 4).  As an initial matter, I disagree with Delucia's contention that the record demonstrates that these limitations, if credited, would preclude Delucia from competitive work. First, Landsman's opinion about Delucia's ability to complete tasks independently was offered in response to a compound question asking about both simple *and* complex tasks.  The record does not reveal his opinion on the issue of simple tasks alone.  In any event, Landsman opined that Delucia was capable of working forty hours per week as long as he was provided certain accommodations, the majority of which were accounted for in the ALJ's RFC, as discussed above.

Indeed, the only accommodation identified by Landsman that was not explicitly accounted for in the RFC was a "hand[s]-on" job with "lots of feedback."  (Tr. 562).  Delucia maintains that Thompson's testimony demonstrated that such accommodations "would take [Delucia] out of competitive work."  First, I am not certain that Delucia's interpretation of the testimony is accurate.  The vocational expert appeared to testify that he *could* identify jobs that would provide verbal instructions or hands-on supervision or demonstration during the training period, but that he *could not* quantify the specific number of such employers who would be willing to do so.  (Tr. 126-29).  Second, Heller testified that she did not believe that the need for additional feedback would preclude competitive employment.  (Tr. 95).

In any event, I conclude that the ALJ provided "good reasons" for her decision to assign limited weight to Landsman's opinions.  In her decision, the ALJ accorded Landsman's opinions only some weight because she found that they were not supported by the record.  (Tr. 29-30).  Specifically, the ALJ noted that the limitations assessed by Landsman were inconsistent with Delucia's work history, including his current employment.  (Tr. 29).  Indeed, during the hearing, Delucia testified that he had undergone three days of training at his current job before performing the job on his own.  (Tr. 106).  Although other employees were available to provide guidance, he indicated that he had not received any negative feedback or reprimands from his supervisor and that he generally was able to perform the requirements of the job.  (Tr. 44-45).

Further, the ALJ properly concluded that some of the limitations assessed by Landsman were inconsistent with Delucia's infrequent and relatively conservative treatment and with the other medical assessments contained in the record.  Specifically, the record contained five other medical opinions, each of which identified only mild or moderate limitations, and all of which were consistent with the RFC assessed by the ALJ.  (Tr. 378-81, 396-400, 644-47, 672-84, 699-707).  Accordingly, I conclude that the ALJ did not violate the treating physician rule by according "some weight" to Landsman's opinions for the reasons she explained.  *See Harrington v. Colvin*, 2015 WL 790756, *16 (W.D.N.Y. 2015) (ALJ properly discounted treating physician opinion where it assessed limitations that were inconsistent with findings contained in the treatment records and with admissions claimant had made concerning his activities of daily living); *Wilferth v. Colvin*, 49 F. Supp. 3d 359, 362 (W.D.N.Y. 2014) (ALJ properly weighed treating physician opinion and "adequately explained her reasons for declining to grant controlling weight to his conclusion" where opinion was "inconsistent with other

opinions in the record, as well as statements made by the plaintiff himself, and none of the

objective test records . . . indicate[d] a level of disability greater than that reflected in the

plaintiff's RFC, as determined by the ALJ"); *Gladle v. Astrue*, 2008 WL 4411655, *5 (N.D.N.Y.

2008) (ALJ properly discounted opinion of treating physician where it was inconsistent with

treatment records and objective findings of the consultative examiner).

   Delucia contends that the ALJ's conclusion that Landsman's opinion is not

supported by the record is inconsistent with her determination to accord great weight to Steiner's

opinion because Steiner himself indicated that the limitations assessed by Landsman were

supported by the record. (Docket ## 10-1 at 22-23; 16 at 3-4). I disagree. In his opinion,

Steiner indicated that he had reviewed the medical opinions contained in the record and that the

limitations identified by the opinions, including Landsman's opinion, were generally supported

by the record, although he noted some variations in opinion regarding whether Delucia's

limitations were mild or moderate. (Tr. 704). At the hearing, Steiner clarified that although he

had assessed only mild limitations, he believed that Landsman's opinion was consistent with his

because Landsman ultimately concluded that, despite the moderate limitations he had assessed,

Delucia was able to work forty hours per week with some accommodations – a conclusion that

would not preclude employment, in Steiner's estimation. (Tr. 57-58). In other words, Steiner's

testimony makes clear that he considered Landsman's opinion consistent with the record because

Landsman concluded that Delucia was able to engage in full-time employment.

   In any event, I conclude that the ALJ's RFC assessment was supported by

substantial evidence. The record reflects that Delucia has suffered from mental impairments,

particularly ADHD, for the majority of his life. Delucia has sought treatment for his

impairments infrequently, despite evidence demonstrating significant improvement with

treatment.  For instance, Delucia's educational and treatment records demonstrate that his grades and ability to focus significantly improved after he began taking medication to address his ADHD.  Yet, Delucia did not seek treatment for almost five years between 2005 and 2010, until a few weeks prior to his alleged onset date.[7]  (Tr. 619-20).

Vocational records suggest that Delucia's academic skills were in the low adult secondary education level for reading and the high intermediate basic education level for mathematics.  (Tr. 532-40).  Based upon his testing results, Delucia appeared able to perform jobs that required him to follow simple, multi-step directions, read common forms and manuals, interpret information from various sources, and write or explain tasks to others.  (*Id.*).  Delucia also demonstrated proficiency in computer skills and an ability to operate common computer applications.  (*Id.*).

Further, nothing in Delucia's work history suggests that he was unable to perform unskilled work with a customary level of training and supervision.  Although Delucia testified that he experienced difficulty keeping pace in a fast food restaurant, Delucia did not identify the need for increased supervision or training at his current or former jobs, including his position at Volunteers of America, his position as an injection molding machine operator, and his current position sorting mail.  Indeed, although he was let go from his previous position as an injection molding machine operator, the record reveals that the job was temporary and that the employer was willing to find another placement for Delucia, but Delucia did not have transportation. (Tr. 446).  Further, Delucia testified that although he sometimes received feedback from his current supervisors about his job performance, he had not received any reprimands or formal write-ups.  (Tr. 44-45).  On this record, I conclude that the ALJ's RFC assessment was

---

[7]  Delucia had previously applied for benefits, which were denied by decision dated July 7, 2011. (Tr. 222).  Delucia requested to reopen the previous application and amended his onset date from July 8, 2011 to April 25, 2010.  (Tr. 220, 354).

reasonable and supported by substantial evidence.  *Pellam v. Astrue*, 508 F. App'x 87, 90-91 (2d

Cir. 2013).

       Delucia also contends that the ALJ's RFC assessment was flawed because the

ALJ improperly rejected the "quiet room" limitation assessed by Steiner.  (Docket ## 10-1 at

24-26; 16 at 4-5).  I find, to the contrary, that substantial evidence supports the ALJ's

determination.  In her decision, the ALJ discussed at length the opinions provided by Steiner and

accorded the opinions "great weight."  (Tr. 31-32).  Nevertheless, the ALJ disagreed with

Steiner's opinion that Delucia would need a "quiet room" in order to engage in work activities.

(Tr. 28).  As the ALJ noted, Delucia's testimony demonstrated that he was performing

adequately at his current job sorting mail in an open airport warehouse with approximately

fifteen coworkers in the vicinity of active runways.  (*Id.*).

       Delucia maintains that his current employment should not have been considered

by the ALJ because he only works part time.  (Docket # 16 at 4-5).  Although Delucia is correct

that his current employment does not constitute substantial gainful activity, he is wrong that the

ALJ was not free to consider the conditions of Delucia's employment and his ability to satisfy

the job requirements in evaluating the limitations assessed by Steiner.  In addition, the record

reflects that Delucia worked in several other positions, but never indicated an inability to

perform the requirements of those positions due to excessive noise.  Accordingly, I conclude that

the ALJ did not improperly reject Steiner's noise limitation.

       Further, the vocational expert excluded jobs involving excessive noise.  (Tr. 86).

Thus, the positions identified by the vocational expert would expose Delucia to no more than a

moderate level of noise.  (Tr. 85-86).  Nothing else in the record suggests that Delucia in unable

to perform activities within his RFC within such an environment.  In any event, the linen room

attendant position identified by the vocational expert is classified as quiet under the DOT.  *See*

DOT 222.387-030, 1991 WL 672098 (2008).  Accordingly, any error by the ALJ in rejecting the

quiet limitation was ultimately harmless.

   In sum, I conclude that the ALJ's RFC assessment was based upon a thorough

review of the record and was supported by substantial record evidence.  *Zabala v. Astrue*, 595

F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians who examined [claimant] indicated that

she had anything more than moderate limitations in her work-related functioning, and most

reported less severe limitations[;] [a]lthough there was some conflicting medical evidence, the

ALJ's determination that [p]etitioner could perform her previous unskilled work was well

supported").

### B. Development of the Record by the ALJ

   Finally, I turn to Delucia's contention that the ALJ assumed an adversarial role in

evaluating his claim.  (Docket ## 10-1 at 27; 16 at 5-7).  Delucia maintains that the ALJ's actions

in developing the record, failing to re-contact Landsman, and aggressively questioning the

vocational experts reveal her bias against Delucia.  (*Id.*).  Having carefully reviewed the record,

particularly the hearing testimony, I disagree.

   "[D]ue process requires that [an] ALJ[] be impartial and unbiased during

administrative proceedings."  *Pabon v. Comm'r of Soc. Sec.*, 2015 WL 4620047, *5 (S.D.N.Y.)

(citing *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982)), *report and recommendation*

*adopted*, 2015 WL 5319265 (S.D.N.Y. 2015).  Indeed, a presumption exists that ALJs are

unbiased and "exercise their decision-making authority with honesty and integrity."  *Id.*  "A

claimant alleging the denial of a fair hearing . . . bears the burden of showing a 'conflict of

interest or some other specific reason for disqualification.'"  *Id.* (quoting *Schweiker v. McClure*,

456 U.S. at 195).  The basis for the disqualification must be clear from the record and "cannot be

based on speculation or inference," *Card v. Astrue*, 752 F. Supp. 2d 190, 191 (D. Conn. 2010),

and a claimant alleging bias "faces a difficult burden," *Pabon v. Comm'r of Soc. Sec.*, 2015 WL

4620047 at *5.

          As an initial matter, the ALJ's decision to further develop the record by obtaining

a comprehensive psychiatric and intelligence evaluation and by consulting a medical expert does

not demonstrate that the ALJ was adversarial or biased.  Although a different ALJ may have

chosen to render a decision based on the opinions in the record at the first hearing, I disagree that

those opinions would have supported a finding of disability.  *See* discussion *supra*.  In any event,

the ALJ was within her discretion to evaluate the evidence and determine that further medical

source information would assist her.  *Cf. Van Valkenberg ex rel. B.G. v. Astrue*, 2010 WL

2400455, *17 (N.D.N.Y.) ("the regulations leave calling a medical expert to the discretion of the

ALJ"), *report and recommendation adopted*, 2010 WL 2400443 (N.D.N.Y. 2010); *Carlson v.

Barnhart*, 2006 WL 2926818, *15 (D. Conn. 2006) ("[w]ith respect to the need for a medical

expert, the decision to obtain medical expert testimony is left to the discretion of the ALJ").

          Nothing in the record suggests that the ALJ attempted to influence the

post-hearing opinions of Ransom or Steiner.  A review of the ALJ's interrogatories to Steiner

demonstrates that the questions were neutral and not apparently designed to elicit any particular

answer.  (Tr. 700-07).  Indeed, the interrogatories specifically asked Steiner whether he had

discussed the substance of the case with the ALJ, the hearing office staff, or the claimant's

representative.  (Tr. 700).  Steiner affirmed that he had not.  (*Id.*).  During the subsequent

hearing, the ALJ permitted the claimant's attorney to fully examine Steiner and herself asked

only a few clarifying, generally non-leading questions.  (Tr. 47-48, 64-65).  These facts are

wholly distinguishable from those at issue before the court in *McAninch v. Astrue*, 2011 WL 4744411, *19 (W.D.N.Y. 2011), relied upon by Delucia. (*See* Docket # 10-1 at 28).

   I reject Delucia's contention that the ALJ had a duty to re-contact Landsman prior to rendering her decision. As discussed at length above, Landsman provided treatment to Delucia for only a brief period of time, and the record contained Landsman's notes of those sessions. *See also Gabrielson v. Colvin*, 2015 WL 4597548, *6 (S.D.N.Y. 2015) ("[t]he regulations that now control, 20 C.F.R. 404.1520b(c)(1) and 416.920b(c), provide that re-contacting the treating physician is an *option* for correcting inconsistencies in the record").

   Finally, I conclude that the ALJ's questioning of the vocational experts does not warrant a finding of bias. During the first hearing, the ALJ questioned Thompson at length regarding what the ALJ originally referred to as a "hands-on" limitation. (Tr. 124-30). After Thompson articulated his understanding of the term "hands-on," the ALJ attempted to clarify the limitation for which she was attempting to obtain information. (Tr. 125). The testimony demonstrates that although the ALJ was interested in the effect on employability of a need to have spoken instructions or training demonstrations, Thompson understood the question to involve additional instruction outside of the typical training period. (Tr. 124-25). The ALJ asked follow-up questions relating to the limitation in an attempt to clarify Thompson's testimony. (Tr. 126-30). The ALJ's colloquy with Heller at the second hearing likewise reflected her effort to understand a suggested limitation – the need for a "quiet room." The ALJ explored with Heller the meaning of the term "quiet," whether the DOT categorized positions by varying degrees of noise, and whether the need for quiet working conditions would affect Delucia's employability. (Tr. 82-86). Neither line of inquiry with Thompson or Heller demonstrated bias or hostility on the part of the ALJ. Further, upon completion of her

examination, the ALJ permitted Delucia's attorney to cross-examine both experts.  Under these circumstances, remand is not warranted.  *See, e.g.*, *Pabon*, 2015 WL 4620047 at *7 (claimant failed to overcome presumption that ALJ was unbiased and fair; even if the ALJ's questions were leading, they were "intended to further – not disrupt – the fact finding process," and the ALJ "permitted [plaintiff's] counsel to question [plaintiff] and cross-examine the vocational expert without any interruptions intended to limit such testimony"); *Strange v. Comm'r of Soc. Sec.*, 2014 WL 4637093, *6 (N.D.N.Y. 2014) ("[v]iewing the bias allegation in context of the whole case, there is nothing about [the ALJ's] behavior during conduct of the hearing or in penning his decision that suggests extremism or inability to render a fair decision"); *Smead v. Colvin*, 940 F. Supp. 2d 653, 663 (S.D. Ohio 2013) (ALJ's thorough questioning of the vocational expert did not demonstrate an unduly adversarial posture); *Castaldo v. Astrue*, 2012 WL 2847904, *7 (W.D.N.Y. 2012) ("the mere fact that an ALJ asked leading questions is insufficient" to demonstrate grounds giving "rise to 'serious concerns about the fundamental fairness of the disability review process'") (quoting *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 292 (E.D.N.Y. 2004)); *Battaglia v. Astrue*, 2012 WL 1940851, *11 (E.D.N.Y. 2012) (rejecting claim of bias based upon ALJ's "allegedly aggressive questioning style, [and] his repeated interruptions of [plaintiff's] testimony" where "ALJ's questions and 'interruptions' generally served to clarify the testimony and the issues to be decided, and did not demonstrate a clear bias or inability to adjudge plaintiff's disability claim fairly"); *Osorio v. Barnhart*, 2007 WL 1519531, *2 (E.D.N.Y. 2007) (rejecting plaintiff's contention that ALJ was "unnecessarily adversarial, hostile, and argumentative" during the hearing where the transcript demonstrated "that the ALJ's behavior did not rise to the level of antagonism contemplated by th[e] [legal] standard").

## CONCLUSION

After careful review of the entire record, this Court finds that the Commissioner's denial of SSI was based on substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 15)** is **GRANTED**.  Delucia's motion for judgment on the pleadings **(Docket # 10)** is **DENIED**, and Delucia's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

_____
        _s/Marian W. Payson_
           MARIAN W. PAYSON
        United States Magistrate Judge

Dated: Rochester, New York
       March 9, 2016